UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

|  |  |  |
|---|---|---|
| NATIONAL ORGANIZATION FOR MARRIAGE, INC., | : |  |
|  | : |  |
|  | : | **MEMORANDUM OF LAW IN** |
| Plaintiff, | : | **OPPOSITION TO PLAINTIFF'S** |
|  | : | **MOTION FOR A** |
| v. | : | **PRELIMINARY INJUNCTION** |
|  | : |  |
| JAMES WALSH, in his official capacity as co-chair | : | Case No.: 10-CV-751 |
| of the New York State Board of Elections; | : |  |
| DOUGLAS KELLNER, in his official capacity as co- | : |  |
| chair of the New York State Board of Elections; | : |  |
| EVELYN AQUILA, in her official capacity as | : |  |
| commissioner of the New York State Board of | : |  |
| Elections; and GREGORY PETERSON, in his | : |  |
| official capacity as commissioner of the New York | : |  |
| State Board of Elections, |  |  |
|  |  |  |
| Defendants. |  |  |

-----------------------------------------------------------------

## PRELIMINARY STATEMENT

Defendants James Walsh and Douglas Kellner, sued in their official capacities as

Co-chairs of the New York State Board of Elections ("Board of Elections"), and Evelyn Aquila

and Gregory Peterson, sued in their official capacities as Commissioners of the Board of

Elections, submit this Memorandum of Law in opposition to the motion of Plaintiff National

Organization for Marriage, Inc. ("NOM"), for an order preliminarily enjoining the

"enforcement" of the definition of a "political committee" (see N.Y. Election Law § 14-100(1))

against NOM.

NOM seeks to finance radio, television, and direct-mail advertisements that

promote candidates opposed to same-sex marriage (and that oppose candidates who support

same-sex marriage) in New York in the days immediately preceding the general election on

November 2, 2010.  See Verified Complaint (the "Complaint"), at ¶ 8.  Assuming that NOM

would spend at least $1,000 to fund advertisements expressly advocating in favor of or in

opposition to certain candidates, Article 14 of the New York Election Law (the "Election Law")

would require NOM to register as a "political committee" with the New York State Board of

Elections (the "Board of Elections").  It would also be required, inter alia, to designate a

treasurer and depository, and to file electronic reports disclosing contributors and expenditures.

 NOM does not want to abide by these rules.  The fact that all other political

committees must follow them is of no concern to NOM.  "[F]ighting hard to keep its donors and

supporters private," NOM has commenced this action – the latest in a line of challenges to

campaign finance regulations in multiple states – on the eve of the upcoming election.  NOM,

quite simply, seeks to gain preferential status to support and oppose candidates for public office

without disclosing from whom it obtains and how it spends money.  See Exhibit A to the

Declaration of Craig R. Bucki, Esq., executed on October 13, 2010 ("Bucki Ex. ___").  The

Court should decline to accord NOM such special treatment, with fewer than two weeks left

before the 2010 general election.

 In order to succeed on its motion for a preliminary injunction, NOM must

establish that it "will likely succeed on the merits," or "that there are sufficiently serious

questions going to the merits of the case to make them a fair ground for litigation, and that a

balancing of hardships tips 'decidedly'" in NOM's favor.  Juergensen Defense Corp. v. Carleton

Techs., Inc., 2009 WL 2163181, *3 (W.D.N.Y. July 20, 2009) (Arcara, J.) (quoting Genesee

Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir. 1997)).  NOM cannot satisfy any

of these criteria.

 First, NOM will not prevail on the merits of its claims.  The definition of a

"political committee" in Election Law § 14-100(1) is not vague or overbroad; rather, as

construed by New York State courts, it appropriately limits "political committee" status to entities that engage in "express advocacy" (viz., supporting or opposing candidates for public office), and exempts speech purely about issues of public concern.

The definition also passes both exacting scrutiny and strict scrutiny, to the extent that it is claimed to deprive NOM's right to speak freely pursuant to the First Amendment to the United States Constitution.  It applies registration and disclosure requirements to those organizations to achieve New York State's compelling interest in informing citizens as to the source of campaign funds, and how they are spent.

Second, denial of the injunction will not cause NOM to suffer irreparable harm. Although not disclosed by NOM, it has registered a political committee called "NOM PAC NY," which has already solicited donations, made expenditures, and filed campaign finance reports with the Board of Elections.  Subjecting NOM to political committee status, therefore, would not prevent it from registering an unauthorized committee to run any of the advertisements it proposes for the final days of the 2010 general election campaign, and would not present a burden that NOM has not already undertaken voluntarily.  NOM's decision to wait to bring this action until the eve of the election also belies any notion of urgency or irreparable harm.

Third, the equities do not balance in NOM's favor.  The award of a preliminary injunction affording preferential treatment to NOM would undermine the public interest in transparency in New York elections; would unfairly disadvantage the political committees that have complied with the registration, reporting, and disclosure requirements in Article 14 of the Election Law; and would create confusion statewide as to the status of New York's campaign finance laws on the eve of a general election.  New York's campaign finance laws should not be suspended for NOM alone.

For these reasons, NOM's motion for a preliminary injunction must be denied.

## STATEMENT OF FACTS

### A.   Background

On September 13, 2010, Plaintiff filed its Verified Complaint (the "Complaint") seeking an order declaring the unconstitutionality of New York's definition of a political committee (see N.Y. Election Law § 14-100(1)) and enjoining its "enforcement" against NOM. The Complaint was served on Defendants on September 20, 2010.

Plaintiff claims to be a non-profit corporation that intends to "protect marriage" by leading "marriage-related initiatives at the state and local level." Complaint ¶ 8, Ex. 1.[1] Plaintiff alleges to be a non-sectarian and non-partisan organization, not connected with any political candidate or political party, or with any political committee other than its own. Id. ¶ 7. Plaintiff seeks to finance radio, television, and direct-mail advertisements that promote candidates opposed to same-sex marriage (and that oppose candidates who support same-sex marriages) in New York on the eve of the 2010 general election. Id. ¶ 8.

Although NOM's Complaint alleges that "none of its speech has express advocacy" (Complaint ¶ 9), and that none of its speech is coordinated or under the control of any New York political candidates or related committees (id. ¶¶ 12, 17), NOM then alleges that it "reasonably fears" that it will constitute a political committee under New York law (id. ¶ 19). NOM then speculates – with no substantiation – that Defendants will subject NOM to enforcement and civil and criminal prosecution if it runs its contemplated advertising.  It claims it will be "chilled" from speaking freely during the 2010 election campaign.  See id. ¶¶ 15, 17.

---

[1] This exhibit is *also available at*: http://www.nationformarriage.org/site/c.omL2KeN0LzH/b.3479573/k.E2D0/About_NOM.htm.

**B.**     <u>NOM's Activities to Support and Oppose Candidates for Public Office</u>

In support of its constitutional claims, NOM alleges that "political committee"

status in New York would subject it to "a panoply of burdens," such as registration with the

Board of Elections, record-keeping, and disclosure of contributions and expenditures.  Complaint

¶ 19.  "The weight of these burdens is such that the speech would simply not be worth it for

NOM," the Complaint further alleges.  <u>Id.</u> ¶ 20.  Established facts belie this conclusory assertion.

For example, NOM neglects to mention in its papers it registered a political

committee called "NOM PAC NY" (also known as "National Organization for Marriage PAC

New York") with the Board of Elections in 2009.  <u>See</u> Affidavit of Elizabeth C. Hogan, sworn to

on October 13, at ¶ 30 ("Hogan Aff. ¶ ___").  At the time of its registration, NOM Executive

Director Brian Brown declared that the committee would have "an initial target goal of $500,000

to fund primary challenges for any Republican state senator who votes for gay marriage," and

would also "aid Democratic candidates who want to buck the establishment on the marriage

issue, and . . . help in general election contests."  Bucki Ex. C.  NOM PAC NY has solicited

donations, made expenditures, and filed campaign finance reports with the Board of Elections

throughout 2010.  <u>See</u> Bucki Ex. M.

The Complaint also fails to divulge NOM's extensive political activities

throughout the United States, from coast to coast.  Publicly available information reveals that

NOM has spent millions of dollars to support and oppose candidates and ballot initiatives in

multiple jurisdictions, including California (<u>see</u> Bucki Ex. H, L), New York (<u>see</u> <u>id.</u> Ex. C, K, L),

New Hampshire (<u>see</u> <u>id.</u> Ex. G, L), Iowa (<u>see</u> <u>id.</u> Ex. J, L), Hawaii (<u>see</u> <u>id.</u> Ex. L), Minnesota (<u>see</u>

<u>id.</u> Ex. E), Massachusetts (<u>see</u> <u>id.</u> Ex. B, I), Maine (<u>see</u> <u>id.</u> Ex. L), and the District of Columbia

(<u>see</u> <u>id.</u> Ex. F).

**C.**   **The Public Interests Served by Disclosure of Campaign Contributions and Spending**

NOM's Complaint has styled this action as a challenge solely to New York's definition of a "political committee" in Election Law § 14-100(1).  In truth, however, NOM contests more than the constitutionality of a definition:  it seeks an exemption from the Election Law Article 14 requirements that it, like all other political committees, disclose its contributions and expenditures used to support or oppose political candidates.  "The principal reason for determining that an organization is a 'political committee' under the Election Law is to require it to abide by the registration, organization, record-keeping, and reporting requirements that are essential for effective disclosure."  Affidavit of Richard Briffault, sworn to on October 13, 2010 at ¶ 11 ("Briffault Aff. ¶ ___").

The accompanying affidavits of Columbia Law School Professor Richard Briffault and Board of Elections Enforcement Counsel Elizabeth C. Hogan demonstrate that New York State and the public at large have a compelling interest in requiring disclosure.  It serves the goals of, inter alia: (i) informing voters about the sources of campaign money, (ii) affording voters a context in which to understand campaign messages, (iii) protecting the interests of donors, (iv) promoting transparency and public confidence in the electoral process, (v) deterring corruption and the appearance of corruption by contributors, and (vi) assisting the Board in allocating limited resources to identify Election Law violations.  Briffault Aff. ¶¶ 4-7; Hogan Aff. ¶¶ 10-11, 14, 16, 47-51.  Exempting NOM from the requirements of Election Law Article 14 would undermine these interests, and would jeopardize the ability of the Board of Elections to apply the Election Law even-handedly throughout the State, fewer than two weeks before the 2010 elections.  See Hogan Aff. ¶ 48.

# ARGUMENT

NOM is not entitled to a preliminary injunction unless it meets its burden to establish that:

> (A) the injunction is necessary to prevent irreparable harm; and (b) either that (I) it is likely to succeed on the merits of the underlying claim or (ii) there are sufficiently serious questions going to the merits of the claim to make it a fair ground for litigation and that the balance of hardships tips decidedly in [its] favor.  The award of a preliminary injunction is an <u>extraordinary</u> and <u>drastic</u> <u>remedy</u> <u>that</u> <u>will</u> <u>not</u> <u>be</u> <u>granted</u> <u>absent</u> <u>a</u> <u>clear</u> <u>showing</u> <u>that</u> <u>the</u> <u>plaintiff</u> <u>has</u> <u>met</u> <u>its</u> <u>burden</u> <u>of</u> <u>proof</u>.

<u>Douglas v. Niagara County Bd. of Elections</u>, 2007 WL 3036809, *3 (W.D.N.Y. Oct. 16, 2007) (Arcara, J.) (internal citations omitted) (emphasis added).  Because NOM will not prevail on the merits of its claims, because NOM has not alleged irreparable harm, and because the equities do not balance in NOM's favor, NOM's motion for a preliminary injunction must be denied.

## A.     NOM Will Not Succeed on the Merits of Its Constitutional Claims.

NOM alleges that the definition of a "political committee" in Election Law § 14-100(1) is unconstitutional because:  (1) it is vague, (2) it is overbroad, and (3) it violates the First Amendment to the United States Constitution on its face.  Each of these claims lacks merit.[2]

### 1.     Election Law § 14-100(1) Is Not Vague.

Election Law § 14-100(1) provides the following definition of a "political committee," in pertinent part:

---

[2] Notwithstanding the lack of substantive merit of NOM's causes of action, NOM is also unlikely to prevail in this case because the Complaint fails to state a claim, and because NOM does not have standing to sue the Co-chairs or the Commissioners of the New York State Board of Elections.  In further opposition to NOM's motion for a preliminary injunction, Defendants incorporate by reference into this Memorandum of Law their arguments presented in the memorandum of law (filed with the Court on October 12, 2010) supporting their pending motion to dismiss the Complaint.

[A]ny corporation <u>aiding</u> <u>or</u> <u>promoting</u> and any committee, political club or combination of one or more persons operating or co-operating <u>to</u> <u>aid</u> <u>or</u> <u>promote</u> <u>the</u> <u>success</u> <u>or</u> <u>defeat</u> <u>of</u> <u>a</u> <u>political</u> <u>party</u> <u>or</u> <u>principle</u>, or of any ballot proposal; <u>or</u> <u>to</u> <u>aid</u> <u>or</u> <u>take</u> <u>part</u> <u>in</u> <u>the</u> <u>election</u> <u>or</u> <u>defeat</u> <u>of</u> <u>a</u> <u>candidate</u> <u>for</u> <u>public</u> <u>office</u> <u>or</u> <u>to</u> <u>aid</u> <u>or</u> <u>take</u> <u>part</u> <u>in</u> <u>the</u> <u>election</u> <u>or</u> <u>defeat</u> <u>of</u> <u>a</u> <u>candidate</u> for nomination at a primary election or convention . . .; <u>but</u> <u>nothing</u> <u>in</u> <u>this</u> <u>article</u> <u>shall</u> <u>apply</u> <u>to</u> <u>any</u> <u>committee</u> <u>or</u> <u>organization</u> <u>for</u> <u>the</u> <u>discussion</u> <u>or</u> <u>advancement</u> <u>of</u> <u>political</u> <u>questions</u> <u>or</u> <u>principles</u> <u>without</u> <u>connection</u> <u>with</u> <u>any</u> <u>vote</u> . . . .

(Emphasis added.)  NOM contends that this definition is vague, insofar as it includes corporations that aid or promote "the success or defeat of a political . . . principle," or that "aid or take part in the election or defeat of a candidate."  This argument has already been rejected by New York State courts.

In <u>Matter of Klepper v. Christian Coalition of New York Inc.</u> ("<u>Klepper</u>"), 259 A.D.2d 926, 686 N.Y.S.2d 898 (3d Dep't 1999), the petitioners sought a declaration that the Christian Coalition of New York Inc. ("CCNY") constituted a political committee pursuant to Election Law § 14-100(1), and was subject to the financial disclosure requirements set forth in Election Law Article 14.  In response, CCNY – represented by NOM's lead counsel in this action – challenged the constitutionality of Election Law § 14-100(1), on the basis that it could be read to regulate CCNY's "right to engage in 'issue advocacy.'"  <u>Klepper</u>, 259 A.D.2d at 927, 686 N.Y.S.2d at 900.

The Court disagreed.  It relied upon the decision of the United States Supreme Court in <u>Buckley v. Valeo</u> ("<u>Buckley</u>"), 424 U.S. 1 (1976), which had considered the meaning of a limitation on campaign expenditures "relative to a clearly identified candidate" in the Federal Election Campaign Act of 1971 ("FECA").  <u>Id.</u> at 13 (<u>quoting</u> former 18 U.S.C. § 608(e)(1) (1974)).  The Supreme Court determined that this phrase was vague, because it "fail[ed] to clearly mark the boundary between permissible and impermissible speech."  <u>Buckley</u>, 424 U.S.

at 41.  To resolve this vagueness, however, the Court construed the statute to govern only

"expenditures for communications that in express terms advocate the election or defeat of a

clearly identified candidate for federal office."[3]  Id. at 44.

The Court in Klepper applied a similar construction to Election Law § 14-100(1):

> Issue advocacy is protected by the First Amendment and includes communications that discuss an organization's views on issues endorsed by a political candidate or party without expressly advocating the election of that candidate or party.  Significantly, Election Law § 14-100(1) specifically exempts issue advocacy from the restrictions contained in article 14 by providing that "nothing in this article shall apply to any committee or organization for the discussion or advancement of political questions or principles without connection with any vote . . . .  Inasmuch as this savings provision preserves the unencumbered right of an organization to engage in issue advocacy, we find no merit to CCNY's facial challenge to the constitutionality of the provisions at issue.

Klepper, 259 A.D.2d at 927, 686 N.Y.S.2d at 900.

Thus, Klepper imposed upon Election Law § 14-100(1) an interpretation that

binds this Court.[4]  A corporation aiding or promoting[5] a political principle, or taking part in a

---

[3] Even though NOM's lead counsel represented the respondent in Klepper, that case is not mentioned anywhere in NOM's motion papers.

[4] NOM incorrectly contends that this Court cannot impose a narrowing gloss upon Election Law § 14-100(1), a State statute, to avoid a vagueness challenge.  See Plaintiff's Preliminary Injunction Brief ("Pltf. Br."), at p. 26.  The Appellate Division already has done so appropriately, because a New York State court should construe a State statute, "if possible, to uphold its constitutionality."  N.Y. STAT. § 150(c).  This Court is "bound to follow the interpretation of the Appellate Division" of Election Law § 14-100(1), "in the absence of persuasive evidence that the New York Court of Appeals would rule differently if presented with the issue."  In re Ephedra Prods. Liab. Litig., 598 F. Supp. 2d 535, 537 (S.D.N.Y. 2009).  Accord, Broder v. Cablevision Sys. Corp., 418 F.3d 187, 199-200 (2d Cir. 2005); Pentech Int'l, Inc. v. Wall St. Clearing Co., 983 F.2d 441, 445 (2d Cir. 1993).  On an appeal from a determination of the merits of this case, the Second Circuit Court of Appeals may certify, if it deems necessary, the question of the interpretation of Election Law § 14-100(1) to the New York Court of Appeals, pursuant to the procedure provided by 22 N.Y.C.R.R. § 500.27.

candidate's election or defeat, constitutes a "political committee" only if it engages in the "express advocacy" described by <u>Buckley</u> – not if it engages solely in "issue advocacy" and refrains from supporting or opposing a candidate for public office.

Several courts have upheld campaign finance laws against constitutional challenges by applying them only to conduct that consists of express advocacy. For example, in <u>Brownsburg Area Patrons Affecting Change v. Baldwin</u>, 714 N.E.2d 135 (Ind. 1999), a civic association (unsuccessfully represented by NOM's lead counsel) contested Indiana's definition of a "political action committee," on the ground that it "impermissibly regulate[d] issue advocacy in violation of <u>Buckley</u>." <u>Id.</u> at 138. The Indiana Supreme Court interpreted the law "to reach only funds used for communications that <u>expressly</u> <u>advocate</u> the election or defeat of a clearly identified candidate." <u>Id.</u> at 141 (internal brackets omitted and emphasis added). In <u>Minnesota Citizens Concerned for Life, Inc. v. Kelley</u>, 698 N.W.2d 424 (Minn. 2005) (in which the plaintiff again was unsuccessfully represented by NOM's lead counsel), the Minnesota Supreme Court likewise imposed a narrowing gloss on Minnesota election law's definitions of "political committee" and "political fund" to restrict their application to express advocacy. The imposition of such a limiting construction ensures that a statutory definition of a political committee applies "within constitutional bounds by drawing a line between express advocacy

---

[5] NOM submits that verbs such as "aid" or "promote" in Election Law § 14-100(1) are vague. <u>See</u> Pltf. Br. p. 7. This is not so: both verbs are synonyms of "support," a word which several courts have found <u>not</u> to be vague or overbroad in the context of campaign finance laws. <u>See</u>, <u>e.g.</u>, <u>McConnell v. Fed. Election Comm'n</u>, 540 U.S. 93, 170 n.64 (2003); <u>Ctr. for Individual Freedom, Inc. v. Ireland</u>, 613 F. Supp. 2d 777, 796 (S.D. W. Va. 2009); <u>Real Truth About Obama, Inc. v. Fed. Election Comm'n</u>, 2008 WL 4416282, *13 (E.D. Va. 2008). "Support" and its synonyms are not vague, because they "clearly set forth the confines within which potential party speaks must act," "provide explicit standards for those who apply them," and "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." <u>Voters Educ. Cmte. v. Wash. State Pub. Disclosure Comm'n</u>, 161 Wash. 2d 470, 488, 166 P.3d 1174, 1184 (2007).

and issue advocacy," and "saves it from constitutional infirmity."  <u>Ctr. for Individual Freedom v. Carmouche</u>, 449 F.3d 655, 664 (5th Cir. 2006).

<u>Klepper</u> has already done this by restricting the definition of a "political committee" to entities engaged in express advocacy.  Election Law § 14-100(1), therefore, has already been determined not to be vague, and NOM's first claim for relief must fail.

### 2.      Election Law § 14-100(1) Is Not Overbroad.

Second, NOM argues that the definition of a political committee in Election Law § 14-100(1) is unconstitutionally overbroad, and prohibits speech permitted by the First Amendment to the United States Constitution.  This contention also lacks merit.

The First Amendment, as incorporated to the states through the Fourteenth Amendment, forbids New York State from enacting a statute that "abridge[es] the freedom of speech."  U.S. CONST. amend. I.  NOM contends that Election Law § 14-100(1) is such a statute, and may stand only if it satisfies "strict scrutiny" – <u>viz.</u>, only if it is narrowly tailored to serve a compelling State interest.  NOM argues that <u>Buckley v. Valeo</u> has established a special "major purpose" test to apply strict scrutiny to the definition of a political committee.  Pursuant to this "major purpose" test claimed by NOM, "government may regulate an organization as a political committee only if (1) it is 'under the control of a candidate' or candidates or (2) 'the major purpose' of the organization is the 'nomination or election of a candidate' or candidates in the jurisdiction."  Complaint ¶ 51 (<u>quoting</u> <u>Buckley</u>, 424 U.S. at 79).  NOM argues that it is "not under the control of a candidate," and that nominating and electing candidates in New York is not its "major purpose."  NOM claims, therefore, that § 14-100(1) improperly subjects it to the requirements of Election Law Article 14, and is overbroad as a result.

NOM's argument lacks merit for at least three independent reasons:  (1) exacting scrutiny – a lesser standard than strict scrutiny – is the correct standard of review of the constitutionality of a definition of a political committee, and Election Law § 14-100(1) satisfies exacting scrutiny; (2) § 14-100(1) also satisfies strict scrutiny, which does <u>not</u> compel application of NOM's purported "major purpose test;" and (3) § 14-100(1) satisfies strict scrutiny even under the purported "major purpose test," in that NOM's major purpose is to elect candidates who oppose same-sex marriage.

### a.    Election Law § 14-100(1) Passes Exacting Scrutiny, the Appropriate Standard of Review.

In its Complaint, NOM generalizes that "[s]trict scrutiny applies to government regulation of organizations as political committees."  Complaint ¶ 50.  This assertion is incorrect, given the recent decision of the United States Supreme Court in <u>Citizens United v. Federal Election Commission</u> ("<u>Citizens United</u>"), 558 U.S. ___, ___, 130 S.Ct. 876 (2010).  <u>Citizens United</u> acknowledged that "[l]aws that burden political speech" often are "'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'"  130 S.Ct. at 898 (<u>quoting</u> <u>Wis. Right to Life, Inc. v. Fed. Election Comm'n</u>, 546 U.S. 410, 464 (2006)).  However, this is not so with respect to campaign finance disclosure and reporting requirements:

> Disclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities, and do not prevent anyone from speaking.  <u>The Court has subjected these requirements to</u> "<u>exacting scrutiny</u>," which requires a "substantial relation" between the disclosure requirement and a "sufficiently important" government interest.

<u>Citizens United</u>, 130 S.Ct. at 914 (internal citations, quotations, and brackets omitted and emphasis added).

Designation of a corporation or an organization as a "political committee" in New York does not prevent that entity from speaking about issues or candidates.  It imposes no limit on such speech.[6]  Rather, it merely requires that the entity comply with basic administrative mandates, such as registering with the Board of Elections (see Election Law § 14-118), selecting a treasurer and depository (see id.), record-keeping (see id. §§ 14-118, 14-122), and filing financial reports periodically with the Board (see id. §§ 14-102, 14-106, 14-108).  This Court, therefore, must evaluate the constitutionality of the definition of a "political committee" in Election Law § 14-100(1) pursuant to exacting scrutiny, not strict scrutiny.

Following Citizens United, the Court in National Organization for Marriage, Inc. v. McKee ("McKee II"), ___ F. Supp. 2d ___, 2010 WL 3270092 (D. Me. Aug. 19, 2010), held exacting scrutiny to be the standard for evaluating the constitutionality of an election law that merely "carries consequences," without prohibiting speech related to a campaign.  The Court "reject[ed] NOM's argument that 'strict scrutiny' applies to the [political action committee] definition" in Maine election law.  Id. at *9 n.122.

Election Law § 14-100(1) passes the exacting scrutiny test.  The registration, record-keeping, and reporting requirements of Election Law Article 14 serve the important

---

[6] NOM disagrees.  "[P]olitical-committee status," NOM contends, "is so burdensome and onerous that allowing speech only if an organization forms or becomes a political committee is like banning the organization's speech."  Pltf. Br. p. 11 (citing Citizens United, 130 S.Ct. at 897). This statement misreads Citizens United, which applied strict scrutiny to strike down an "outright ban" on corporate spending to advocate a candidate's election or defeat.  Id.  The definition of a political committee in Election Law § 14-100(1), by contrast, imposes no such ban.  Rather, the Election Law authorizes a corporation itself to spend money to support or oppose candidates of their choice.  Because it does not ban political speech, Election Law § 14-100(1) should be reviewed under the standard of "exacting scrutiny."  Accord, Minn. Citizens Concerned for Life, Inc. v. Swanson, ___ F. Supp. 2d ___, 2010 WL 3768041, *9 (D. Minn. Sept. 20, 2010).

government interest in transparency and disclosure.  <u>McKee</u>, 2010 WL 3270092, *9.  The

rationale underlying this interest is threefold:

> First, disclosure provides the electorate with information as to
> where political campaign money comes from and how it is spent
> by the candidate in order to aid the voters in evaluating those who
> seek [public] office. . . .  Second, disclosure requirements deter
> actual corruption and avoid the appearance of corruption by
> exposing large contributions and expenditures to the light of
> publicity.  This exposure may discourage those who would use
> money for improper purposes either before or after the election. . . .
> Third, and not least significant, recordkeeping, reporting, and
> disclosure requirements are an essential means of gathering the
> data necessary to detect violations of [any] contribution
> limitations. . . .

<u>Citizens United</u>, 130 S.Ct. at 914.

Subjecting the entities defined as political committees to the requirements of

Election Law Article 14, moreover, bears a substantial relation to the interest of transparency.

The registration and record-keeping requirements of Article 14 facilitate the necessary reporting

of political committee expenditures and contributions.  Mandatory electronic filing of financial

disclosure reports permits the Board of Elections to post those reports on its website, and

disseminate information to the public:  citizens may browse the Board's website to research

political committees' expenditures and funding sources, and make informed voting decisions on

that basis.  <u>See</u> Briffault Aff. ¶ 4.

The definition of a "political committee" in Election Law § 14-100(1) satisfies

exacting scrutiny, and does not violate the First Amendment.

> **b.      Election Law § 14-100(1) Also Passes Strict Scrutiny,
> Which Does Not Entail Application of NOM's
> <u>Phantom "Major Purpose" Test.</u>**

NOM argues that:  (i) Election Law § 14-100(1) must satisfy strict scrutiny, and

(ii) § 14-100(1) meets this standard only if it passes a "major purpose" test allegedly formulated

by <u>Buckley</u>.  Pursuant to this supposed test, "government may regulate an organization as a political committee only if (1) it is 'under the control of a candidate' or candidates or (2) 'the major purpose' of the organization is 'the nomination or election of a candidate' or candidates in the jurisdiction."[7]  Pltf. Br. p. 12 (quoting <u>Buckley</u>, 424 U.S. at 79).

NOM derives its purported test from <u>Buckley</u>'s construction of the Federal Election Campaign Act of 1971.  To ensure that regulation of "political committees" under the Act would not "reach groups engaged purely in issue discussion," <u>Buckley</u> correctly declared that the term "political committee" "only encompass[ed] organizations that [were] under the control of a candidate or the major purpose of which [was] the nomination or election of a candidate."  424 U.S. at 79.

Nowhere did <u>Buckley</u> hold that <u>only</u> organizations satisfying this definition could be subject to campaign finance regulation.  In fact, <u>Buckley</u> construed 2 U.S.C. § 434(e) to impose disclosure requirements upon <u>persons</u> <u>other</u> <u>than</u> <u>political</u> <u>committees</u>, provided they had made expenditures to "expressly advocate the election or defeat of a clearly identified candidate."  <u>Buckley</u>, 424 U.S. at 80.

The "major purpose" inquiry in <u>Buckley</u> related only to whether an organization constituted a "political committee" under FECA, as a matter of statutory interpretation.  It did <u>not</u> constitute a test – as NOM argues – to ascertain whether an organization must abide by any campaign finance regulation, as a constitutional matter.  Stated differently, "the major purpose distinction influences the degree to which an organization may be subject to election finance

---

[7] Some federal courts have adopted and applied this "major purpose" test at the urging of NOM's lead counsel.  <u>See</u>, <u>e.g.</u>, <u>N.M. Youth Organized v. Herrera</u>, 611 F.3d 669 (10th Cir. 2010) (in which NOM's lead counsel submitted an <u>amicus</u> <u>curiae</u> brief); <u>N.C. Right to Life, Inc. v. Leake</u>, 525 F.3d 274 (4th Cir. 2008) (in which NOM's lead counsel represented the plaintiff). This Court should decline to follow them, because <u>Buckley</u> created no such test.

regulation; it does not determine whether an organization is constitutionally immune from such regulation." Richey v. Tyson, 120 F. Supp. 2d 1298, 1311 (S.D. Ala. 2000). The United States Supreme Court has confirmed this interpretation, by observing that Buckley's discussion of a political committee's major purpose consisted of an "intermediate step of statutory construction on the way to its constitutional holding," rather than "a constitutional test." Wis. Right to Life, Inc. v. Fed. Election Comm'n, 546 U.S. at 474 n.7. As such, "there is no Supreme Court case applying a so-called 'major purpose' test to the state regulation of [political committees]." McKee II, 2010 WL 3270092, *10. This Court, therefore, should not apply any "major purpose" test to evaluate the constitutionality of Election Law § 14-100(1), because such a test has no basis in the "textual reading of Buckley."[8] Richey v. Tyson, 120 F. Supp. 2d at 1311.

Regardless of NOM's assertion of a "major purpose" test, the definition of a "political committee" in Election Law § 14-100(1) satisfies strict scrutiny. Subjecting political committees to campaign finance regulation serves several compelling governmental interests: in providing information to voters concerning who has spent money to support and oppose candidates for public office (see Nat'l Org. for Marriage, Inc. v. McKee ("McKee I"), 666 F. Supp. 2d 193, 207 (D. Me. 2009); Richey v. Tyson, 120 F. Supp. 2d at 1314), in deterring corruption "by exposing large contributors and expenditures to the light of publicity" (Alaska Right to Life Cmte. v. Miles, 441 F.3d 773, 791-92 (9th Cir. 2006)), and in "gathering the data

---

[8] NOM claims that the Second Circuit Court of Appeals has "limit[ed]" political committees to organizations that pass NOM's purported "major purpose" test. Pltf. Br. p. 14 n.20 (quoting Fed. Election Comm'n v. Survival Educ. Fund, Inc. ("Survival Education Fund"), 65 F.3d 285, 295 (2d Cir. 1995)). That is not true. Rather, Survival Education Fund merely notes in a parenthetical citation that Buckley "suggest[ed] a narrow construction of 'political committee,'" as used in FECA, as "encompassing only those organizations 'under the control of a candidate or the major purpose of which is the nomination or election of a candidate.'" Id. (emphasis added). The Second Circuit has never adopted or applied a "major purpose" test to evaluate the constitutionality of the definition of a political committee.

necessary to detect violations of the campaign finance law" (id. at 792) (internal quotation marks omitted).  Election Law § 14-100(1) – as interpreted by the Court in Klepper – is narrowly tailored to achieve these compelling interests, in that it applies campaign finance regulation only to entities engaged in "express advocacy."

Election Law § 14-100(1), therefore, passes either exacting or strict scrutiny.

> **c.      NOM Would Constitute an Organization Subject to Campaign Finance Regulation, Even Under Its Purported "Major Purpose" Test.**

Even if this Court were to apply the "major purpose" test advocated by NOM, NOM still cannot establish a likelihood of success on the merits.  This is so, because publicly available evidence demonstrates that NOM's major purpose is to elect candidates who oppose same-sex marriage, and to oppose candidates who support it.  For example:

- Upon NOM's formation in 2007, NOM Executive Director Brian Brown stated, "NOM's focus will be in fighting same-sex marriage in the most difficult states, to help candidates that support marriage, and to defeat those candidates that are working to undermine and redefine it" (emphasis added).  See Bucki Ex. B.

- In 2009, NOM announced its registration of "NOM PAC New York" as a political committee in New York State.  In doing so, NOM declared "an initial target goal of $500,000 to fund primary challenges for any Republican state senator who votes for gay marriage."  Brian Brown further commented that NOM was "also looking to aid Democratic candidates who want to buck the establishment on the marriage issue, and to help in general election contests."  Id. Ex. C.

- In its solicitation efforts, NOM has "encouraged supporters of efforts to ban gay marriage to donate to NOM as a means of keeping their names undisclosed.  [NOM] would act as a middle man of sorts, raising funds from individuals and turning them over to state-based campaigns in lump sums, all the while pledging to keep its donor names a secret." Brian Brown promised in one fundraising letter, "[E]very dollar you give to NOM's Northeast Action Plan today is private . . . ."  Id. Ex. D.

- In Minnesota, NOM purchased $200,000 in television advertisements in May 2010 to oppose two gubernatorial candidates who support same-sex marriage.  Id. Ex. E.

- In the District of Columbia in 2010, NOM made contributions to the campaign of a City Council candidate who opposes same-sex marriage. "Obviously we're interested in electing candidates that will support traditional marriage," said Brian Brown. Id. Ex. F.

- In September 2010, NOM issued a press release vowing to "expos[e] the truth about John Lynch," New Hampshire's Governor running for re-election in November 2010. "We want voters to know the truth and we want John Lynch to know that this Election Day is judgment day," said Brian Brown. Id. Ex. G.

- In June 2010, NOM posted on its website a statement trumpeting its "central role in defeating pro-gay marriage GOP Senate candidate Tom Campbell" in the California primary (emphasis added). "All told, [NOM] spent $400,000 in TV ads, automated phone calls and internet advertising." In the same posting, NOM included a clickable button bearing the phrase, "DONATE NOW!" (emphasis in original). "Your gift of $25, $50, or even $500 or more is urgently needed to help make sure we have the resources to stand for marriage wherever the threat arises," said the posting. "Please make a generous contribution today!" Id. Ex. H. NOM also spent money in Massachusetts to support successful United States Senate candidate Scott Brown in January 2010. Id. Ex. I.

- NOM seeks to finance radio, television, and direct-mail advertising supporting and opposing candidates for public office in New York, mere days before the general election on November 2, 2010. This advertising exhorts the public, "[a]s the election approaches," to ask State legislators (all of whom face election this year) whether they support or oppose same-sex marriage. See Complaint Ex. 2, 3, 4, 5. NOM also plans to send postcards supporting State legislators who oppose same-sex marriage to voters residing in those legislators' respective districts. See id. Ex. 6.

Given this evidence, collected without the benefit of discovery, NOM's

conclusory assertion that the election or defeat of political candidates does not constitute its

"major purpose" is patently incorrect.[9]  If necessary, further inquiry into NOM's "major

---

[9] According to NOM's view of the purported "major purpose" test, New York may regulate an organization not controlled by a candidate as a political committee only if its major purpose is to nominate or elect candidates in New York. See Complaint ¶ 51. This jurisdictional limitation finds no support in the text of Buckley. Even if it did, its application would lead to an absurd result: a corporation could devote 2% of its resources to elect candidates in each of the 50 states, yet not be subject to campaign finance regulations in any of them, because electing candidates in a single jurisdiction would not constitute its "major purpose."

As such, this Court should reject the "pernicious" jurisdictional limitation that NOM seeks to impose upon the purported "major purpose" test in order to avoid campaign finance laws in any State. McKee I, 666 F. Supp. 2d at 210 n.96. Election Law Article 14 properly regulates NOM, because NOM's major purpose is to elect or defeat candidates generally, whether they seek office in New York or elsewhere.

purpose" must occur in the context of an evidentiary hearing, or as the result of an orderly and organized process of discovery, including depositions and disclosure of documents evincing NOM's true purpose.  See, e.g., Bucki Ex. L (redacted transcript of deposition taken of Brian Brown in McKee II).

Pending the outcome of discovery, however, NOM's own admissions in publicly available documents provide convincing evidence that NOM's major purpose is to elect and defeat candidates for public office, and that NOM is properly subject to treatment as a political committee in New York.  Even if the "major purpose" test applies, therefore, NOM is unlikely to succeed on the merits of its claim that Election Law § 14-100(1) is overbroad.

### 3.      Election Law § 14-100(1) Is Not Facially Unconstitutional.

Third, NOM alleges that Election Law § 14-100(1) is unconstitutional on its face as violative of the right to free speech under the First Amendment, and for vagueness under the Fourteenth Amendment, because it "ensnares grassroots organizations in New York and elsewhere that communicate about issues" into the definition of a political committee subject to regulation.  Pltf. Br. p. 24.  This is not so.

As discussed above, the Court in Klepper has already correctly interpreted Election Law § 14-100(1) to govern only those entities that undertake express advocacy to support or oppose candidates for public office, not entities that engage purely in speech about issues of public concern.  That narrowing construction – based upon the Supreme Court's opinion in Buckley – ensures that Election Law Article 14 regulates speech within the boundaries set by the United States Constitution.  It distinguishes Election Law § 14-100(1) from statutes held facially unconstitutional because they are not susceptible to a narrowing gloss (see, e.g., N.C. Right to Life, Inc. v. Leake, 525 F.3d at 285-86 (cited at Pltf. Br. p. 24 n.30); Nat'l

<u>Right to Work Legal Defense & Educ. Found., Inc. v. Herbert</u>, 581 F. Supp. 2d 1132, 1151-54

(D. Utah 2008) (same)), or because they regulate activities beyond express advocacy and its

functional equivalents (<u>see</u>, <u>e.g.</u>, <u>Broward Coal. of Condos., Homeowners Ass'ns & Cmty. Orgs.,</u>

<u>Inc. v. Browning</u>, 2009 WL 1457972, *7-8 (N.D. Fla. 2009) (cited at Pltf. Br. p. 24 n.30);

<u>Broward Coal. of Condos., Homeowners Ass'ns & Cmty. Orgs., Inc. v. Browning</u>, 2008 WL

4791004, *10-*12 (N.D. Fla. 2008) (same); <u>Fla. Right to Life, Inc. v. Mortham</u>, 1999 WL

33204523, *4-*5 (M.D. Fla. 1999) (same)).

Pursuant to <u>Klepper</u>, the definition of a "political committee" in Election Law §

14-100(1) is not vague, and does not apply to organizations engaged solely in issue advocacy.

The statute, therefore, is constitutional on its face.

**B.      <u>NOM Has Not Suffered and Will Not Suffer Irreparable Harm.</u>**

In addition to NOM's likelihood of failure on the merits, the Court also should

deny the requested injunction because classification of NOM as a "political committee" in New

York would not cause NOM irreparable (or any other) harm.  This is so, for two reasons.

First, NOM's purported "irreparable harm" – the "loss of [its] First Amendment

freedoms" (<u>see</u> Complaint ¶ 31) (<u>quoting</u> <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976)) – is

speculative at best.  "Although 'the loss of First Amendment freedoms, for even minimal periods

of time, unquestionably constitutes irreparable injury,'" the Second Circuit Court of Appeals has

"not consistently presumed irreparable harm in cases involving allegations of the abridgement

[sic] of First Amendment rights."  <u>Bronx Household of Faith v. Bd. of Educ. of City of N.Y.</u>

("<u>Bronx Household of Faith</u>"), 331 F.3d 342, 349 (2d Cir. 2003) (<u>quoting</u>, <u>in</u> <u>part</u>, <u>Elrod v.</u>

<u>Burns</u>, 427 U.S. at 373).  Thus, a litigant's mere fear of a loss of his right to speak freely, without

more, does not establish irreparable harm, absent evidence that he faces some deprivation of that right.  Bronx Household of Faith, 331 F.3d at 350.

Latino Officers Ass'n v. Safir, 170 F.3d 167 (2d Cir. 1999), is on point.  In that case, the plaintiffs challenged on First Amendment grounds regulations that required New York City police officers to provide advance notice to the Police Department of their intention to speak to a government agency or a private entity regarding Department policy.  The plaintiffs argued that the regulations irreparably harmed them by "chilling" their speech.  The Second Circuit disagreed:  it held that, although the regulations at issue required the plaintiffs to disclose their speech in advance, they did not prohibit the plaintiffs from speaking.  The Court determined that the purported "chill" on the plaintiffs' speech was merely "conjectural" and therefore "not sufficient to establish real and imminent irreparable harm."  Id. at 171.

Such is the case here.  Classification of NOM as a "political committee" under New York law does not prevent NOM from advertising or speaking during the 2010 general election campaign.  At most, Election Law Article 14 merely requires NOM to abide by the same statutory and administrative requirements applicable to every other political committee – such as registering with the Board of Elections, keeping records of its contributions and expenditures, and filing disclosure reports with the Board.  Indeed, NOM has already done so for "NOM PAC NY," the political committee that it has formed in New York State.  See Bucki Ex. M. Enforcement of Election Law § 14-100(1) and Article 14, therefore, does not "chill" NOM's speech, and does not give rise to even a suggestion of irreparable harm.

Second, NOM's delay in seeking an injunction until the eve of the 2010 general election demonstrates a lack of urgency to protect its rights, and a lack of irreparable harm.  Accord, Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985); City of Newburgh v.

Sarna, 690 F.Supp.2d 136, 172 (S.D.N.Y. 2010); Blanksteen v. N.Y. Mercantile Exchange ("Blanksteen"), 879 F.Supp.363, 367 (S.D.N.Y. 1995).  In Blanksteen, for example, the Court declined to enjoin enforcement of a corporate voting rule only three weeks prior to an election of directors.  Noting that the plaintiff in that case, as here, could have sued anytime during the preceding two years, the Court reasoned that the plaintiff had no "excuse for waiting [until] the eve of an election when ballots [had] been printed and the election [was] about to occur," and hence could not establish irreparable harm to justify an injunction.  Id. at 367.

As it did to challenge Maine's campaign finance laws (see McKee II, 2010 WL 3270092 (D. Me. Aug. 19, 2010)), NOM could have commenced this action and sought an injunction years prior to September 2010.  Had NOM done so, the parties would have had ample time to conduct an organized process of discovery and participate in a preliminary injunction hearing.  Instead, NOM waited to seek an injunction (and then secure an adjournment of its own motion) until the eve of New York's 2010 general election.  This delay, as in Blanksteen, further confirms the absence of irreparable harm.

## C.     The Equities Balance Against NOM.

Not only does NOM lack irreparable harm, but the equities balance heavily against preliminarily enjoining enforcement of Election Law § 14-100(1).

The Supreme Court held in Winter v. Natural Resources Defense Council, Inc., ___ U.S. ___, 129 S.Ct. 365 (2008):

> A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.

Id. at 376-77 (emphasis added and internal quotations and citations omitted).

Preliminarily, as discussed above, NOM needlessly and inexcusably waited until the eve of the 2010 general election to sue this case.  The requested injunction, if granted, would allow NOM to spend vast amounts of money to advertise in support of its favored candidates during the last days of the 2010 campaign, without requiring NOM to disclose the source of its funds or the object of its expenditures.  At the same time, political committees with competing interests would be required to play by the rules as they have existed for years.  This extraordinary advantage to NOM would create a significant detriment to the public as well, in at least two respects.

First, an injunction would compromise the public's ability to make informed voting choices during the critical final days of the 2010 election.  There are several public interests served by disclosure of contributions received and expenditures made by political committees.  These include:  (i) informing voters about the sources of campaign money, (ii) affording voters a context in which to understand campaign messages, (iii) protecting the interests of donors, and (iv) promoting transparency and public confidence in the electoral process.  Briffault Aff. ¶¶ 4-7.   To exempt NOM from the requirements of Election Law Article 14 at this late date would defeat these interests, by denying the electorate "information concerning who is seeking to influence their votes, as well as who may be using [campaign] expenditures to win the gratitude of elected officials."  Id. ¶ 13.

Second, such a special exemption for NOM would prejudice the over 10,000 New York political committees that have duly registered with the Board of Elections and disclosed their contributions and expenditures.  To accord NOM privileged status fewer than two weeks before the 2010 general election would unjustly reward NOM for "slumber[ing] on [its] rights"

while it delayed commencement of this action, and would provide incentive for other "political

committee" entities to support candidates while ignoring the requirements of Election Law

Article 14. <u>WPIX, Inc. v. League of Women Voters</u>, 595 F. Supp. 1484, 1493 (S.D.N.Y. 1984).

The "chaos that would ensue" from invalidation of New York's comprehensive method of

campaign finance regulation "in the crucial final weeks before an election" would cause

significant "harm to the public interest," and requires denial of NOM's motion for a preliminary

injunction. <u>Respect Maine PAC v. McKee</u>, ___ F.3d ___, 2010 WL 3861051 (1st Cir. Oct. 5,

2010). The public interest in transparency and conducting clean elections far surpasses NOM's

interest in secrecy.


## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny NOM's motion for an order

preliminarily enjoining the "enforcement" of the definition of a "political committee" in Election

Law § 14-100(1).

Dated: Buffalo, New York     Dated: Albany, New York
  October 13, 2010       October 13, 2010

Respectfully submitted,     Respectfully submitted,

PHILLIPS LYTLE LLP      BROWN & WEINRAUB, PLLC

/s/ CRAIG R. BUCKI_____   /s/ JUSTIN E. DRISCOLL_____
Kenneth A. Manning       Justin E. Driscoll
Michael B. Powers       79 Columbia Street
Craig R. Bucki        Albany, New York  12210
3400 HSBC Center       Telephone No.:  (518) 427-7350
Buffalo, New York 14203     E-mail:  jdriscoll@brownweinraub.com
Telephone No.: (716) 847-8400
E-mail:  cbucki@phillipslytle.com

*Attorneys for Defendants Kellner and Aquila*  *Attorneys for Defendants*
               *Walsh and Peterson*